UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA               :

    - v -     :     <u>OPINION</u>

VERNON SNYPE,     :     02 Cr. 939-3 (DC)

       Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


APPEARANCES:   DAMIAN WILLIAMS, Esq.
        United States Attorney for the
        Southern District of New York
         By: Patrick R. Moroney, Esq.
          Assistant United States Attorney
        One Saint Andrew's Plaza
        New York, NY 10007

        JAMES M. BRANDEN, Esq.
        80 Bay Street Landing, Suite 7J
        Staten Island, NY 10301
         Attorney for Defendant


CHIN, Circuit Judge:

   Before the Court is defendant Vernon Snype's counseled motion for a

sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  *See* Dkt. No. 145.  For the

reasons set forth below, the motion is granted, and Snype's term of life imprisonment is

reduced to time served plus no more than thirty days.

## STATEMENT OF THE CASE

**I.**      **Snype's Background**

Snype was born in New York, New York, on November 25, 1960.  *See* Presentence Investigation Report ("PSR") ¶ 74.  Snype never had a relationship with his father, who drank excessively and was physically abusive.  PSR ¶ 76.  Snype's mother, who raised him and his five siblings, also occasionally abused substances.  PSR ¶ 81. His mother is now deceased.  *See* Dkt. No. 145 at 9.  Of Snype's five siblings, only three remain alive:  Snype's brother, Calvin, died in 1987 from leukemia, and his sister, Andrea, died in 1998 during an asthmatic seizure.  PSR ¶ 75.  Snype continues to be in contact with two of his three remaining siblings -- Charisse and Anita -- both of whom reside in the Bronx.  *See* Dkt. No. 145 at 9.

In 1994, Snype married Marisa Hicks, and the couple had a son, Jameek, in 1996.  PSR ¶ 78.  Around the same time, Snype also had a relationship with Laureen Flowers, who, in 1997, gave birth to Snype's son Unique.  PSR ¶ 80.  Snype thereafter lived with Flowers, Unique, and Destiny -- Flowers's daughter from a prior relationship whom Snype treated as his own.  *See* Dkt. No. 145 at 9.  Although Snype and Hicks separated in 1999, Snype not only remained active in Jameek's life but also assumed paternal care for Hicks's other children from a prior relationship.  PSR ¶ 79.

In 2000, Flowers was diagnosed with schizophrenia.  Snype served as Flowers's sole and primary caregiver, up until he was arrested in July 2002 for the

underlying offense.  PSR ¶ 80.  Snype ensured that Flowers kept her medical

appointments, took her medication, and was properly fed and generally cared for.  *See*

Dkt. No. 145 at 9.  After Snype's arrest and conviction, Flowers suffered numerous

psychotic episodes, she lost her job and apartment, and Snype's children were taken

into foster care.  *Id.* at 10.

Flowers continues -- to this day -- to suffer tremendously.  In a letter to the

Court dated April 20, 2021, Flowers explained the extent of her suffering:

> I currently suffer from mental illness.  Sometimes I am
> alright, but most times [I] hear voices and I don't have the
> ability to tell what's real and what's not. . . .  Ever since
> Vernon has been in prison, my life has been unbearable.  I
> live in homeless shelters and or on the streets.  I cannot
> maintain my thoughts long enough to remember to pay bills
> or to take care of basi[c] things like bathing.  My health is
> bad, and I often feel like I am going to die.  I cannot care for
> myself.  I sometimes urinate on myself and have the same
> clothes on for days before I realize it.  I am constantly
> waking up in the hospital, or on psychiatric wards and don't
> remember how I got there.  I am asking if you can please
> allow Vernon to come, [I know] he loves me and will care for
> me.  My family is all gone.  I have no one to help me.
> Vernon is the only person.

Dkt. No. 145 at 15.

Snype, who was forty-one years old when he committed the underlying

offense, is far from being a one-time criminal offender.  Indeed, Snype had a string of

robbery-related New York State convictions:  a 1980 conviction for robbery in the

second degree, a 1981 conviction for attempted robbery in the first degree, and a 1983

conviction for robbery in the first degree. *See* Dkt. No. 130, Ex. A at 12-14; PSR ¶¶ 49-51,

57-64. All three convictions related to armed robberies of businesses in the Bronx. *Id.*

At the time of these earlier offenses, Snype was eighteen, nineteen, and twenty-two

years old, respectively. PSR ¶¶ 49, 57, 61. For the 1983 conviction, Snype was

sentenced to ten years to life in prison; he was released from prison in 1994. PSR ¶ 64.

## II.      The Underlying Offense, Conviction, and Sentence

On July 6, 2002, Snype and William Partlow stole a vehicle from a parking

attendant at gunpoint, *see* PSR ¶ 16, and drove to First Union Bank in Yonkers, New

York, PSR ¶ 14. There, Snype and Partlow, who were armed with handguns and

disguised with masks and gloves, PSR ¶ 14, stole $35,000 after threatening bank staff

and customers at gunpoint, PSR ¶¶ 14, 16. They were accompanied by three

accomplices, who sat in two separate cars outside the bank and acted as lookouts. PSR

¶ 15.

With police en route to the bank, Snype and Partlow fled the scene by car.

PSR ¶ 17. A high-speed chase ensued on the highway, with Snype and Partlow

shooting their guns at the police cars chasing them. *Id.* After they crashed the getaway

car, Snype and Partlow continued to flee on foot. *Id.* Partlow was found and shot and

killed by police after he threatened them, *id.*, while Snype escaped and was not arrested

until July 11, 2002 -- five days after the robbery, PSR ¶ 24. When he was arrested, Snype

was in possession of $20,000 in cash (much of which was still wrapped in First Union

Bank money bands), fake identification cards, and two loaded firearms.  *Id.*  Snype's

three other accomplices were each arrested for their roles in the robbery.  PSR ¶¶ 18, 21,

22.

        Snype was thereafter indicted for conspiracy to commit bank robbery in

violation of 18 U.S.C. § 371 (Count One); bank robbery and armed bank robbery in

violation of 18 U.S.C. § 2113(a) and (d) (Counts Two and Three); and using and carrying

a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)

(Count Four).  Dkt Nos. 6, 26; PSR ¶¶ 3-6.  A jury found Snype guilty of conspiracy to

commit bank robbery, but it deadlocked on the remaining three counts, as to which I

declared a mistrial.  *See United States v. Snype*, No. 02-CR-0939-3, 2009 WL 2611930, at *2

(S.D.N.Y. Aug. 24, 2009).

        On May 19, 2004, I sentenced Snype for the instant offense.  *See* Dkt. No.

130, Ex. A.  I determined that although a conviction for conspiracy to commit bank

robbery generally exposes a defendant to a maximum prison term of five years, *see* 18

U.S.C. § 371, I was required to sentence Snype to a term of life imprisonment pursuant

to 18 U.S.C. § 3559(c)(1), also known as the "three strikes" law.  *See* Dkt. No. 130, Ex. A at

15, 31.  The "three strikes" law provides that "a person who is convicted in a court of the

United States of a serious violent felony shall be sentenced to life imprisonment if . . .

the person has been convicted . . . on separate prior occasions . . . of . . . 2 or more

serious violent felonies."  18 U.S.C. § 3559(c)(1).  I concluded that Snype's conviction for

bank robbery conspiracy constituted a "serious violent felony" because of section

3559(c)(2)(F)'s enumerated offenses clause, which explicitly lists conspiracy to commit

robbery under 18 U.S.C. § 2113 as a "serious violent felony."  18 U.S.C. § 3559(c)(2)(F)(i);

*see also* Dkt. No. 130, Ex. A at 2-3.  I also concluded that at least two of Snype's prior

robbery convictions qualified as "serious violent felonies" under section 3559(c)(2)(F)'s

residual clause, because New York state convictions for first degree robbery or

attempted first degree robbery have "as an element the use, attempted use, or

threatened use of physical force."  18 U.S.C. § 3559(c)(2)(F)(ii); *see also* Dkt. No. 130, Ex.

A at 13-14.  Hence, as I stated at sentencing, "I have no choice" -- a sentence of life

imprisonment was required.  Dkt. No. 130, Ex. A at 31.[1]

       In addition to life imprisonment, I also imposed restitution in the amount

of $13,419, a mandatory special assessment of $100, and, in the event of release, a period

of supervised release of five years.  *Id.*  Given Snype's financial circumstances, I did not

impose a fine.  *Id.*

       The Second Circuit thereafter affirmed the conviction and sentence.  *See*

*United States v. Snype*, 441 F.3d 119, 153 (2d Cir. 2006).

---

[1]     By order dated May 20, 2004, I clarified for the record that, if not for the "three strikes" statute, the applicable guidelines range for Snype's Offense Level of 37 and Criminal History Category of III would have been 262 to 327 months' imprisonment.  Dkt. No. 58.

### III.        Rehabilitation

Snype has now spent roughly half of his life behind bars.  But this time has not been wasted.

Snype received his GED in 1979 and his Bachelor of Arts with a major in psychology in 1989 -- both while imprisoned on prior convictions.  PSR ¶ 85.  Upon his release from prison in 1994 and up until his arrest for the instant offense, Snype worked as a mental health, rehabilitation, or substance abuse counselor at various centers and hospitals.  PSR ¶ 88-94.  He also enrolled in a master's program and earned forty credits towards that degree.  PSR ¶ 86.

In light of Snype's impressive educational history, the prison system has been unable to offer him much by way of education over the past twenty-one years.  *See* Dkt. No. 130, Ex. B. at 3.  Although there were several vocational programs that Snype wished to participate in, such as computer programming, prison regulations precluded him from doing so because of his life sentence.  *Id*.  Nonetheless, Snype has not remained idle.  Since 2002, Snype has worked hard while in prison, earning enough to satisfy his special assessment fee and judgment of restitution, *see* Dkt. No. 113 ($13,519.00), and to amass a substantial amount in savings, *see* Dkt. No. 145 at 45 ($9,520.31).  At times, Snype served as a suicide watch companion for other inmates, a role for which he is particularly suited given his education and experience.  *See* Dkt. No. 130, Ex. B. at 3.  Moreover, Snype has largely stayed out of trouble; his "BOP

disciplinary record . . . reflects only several minor violations over nearly two decades of incarceration." Dkt. No. 130 at 5.

The extent of Snype's rehabilitation is best evidenced by letters from staff at Federal Correctional Institution ("FCI") Allenwood. Unit Secretary C. Shoemaker wrote that it "is remarkable" that "Snype has only received low[-]level disciplinary reports for minor infractions," given that he "has been incarcerated for 22 years" and "was incarcerated at a high security prison at one point." Dkt. No. 145 at 22. Shoemaker included an anecdote of Snype approaching another incarcerated person "in a mature mentoring way" to advise him that his behavior towards Allenwood staff was disrespectful. *Id.* Shoemaker shared his belief that "Snype is more than prepared for society and should be given the opportunity to show his growth with another chance." *Id.*

The letter from Senior Officer A. Wilson spoke even more highly of Snype. Wilson has known Snype since March of 2016 and has been his block officer for multiple years. *Id.* at 23. Wilson described Snype as a "mild mannered and a well-spoken individual" who has shown "a willingness to help those that need it" and often uses "his great verbal skills to defuse situations that could have become violent." *Id.* at 23-24. Wilson has witnessed Snype not only offer help to "younger rookie staff members coming into the prison" but also give ample guidance to younger inmates by taking them "under his wing to teach them the skills they need to not become idle in the

prison system." *Id.* at 23.  Wilson has seen Snype excel as an employee, first working "in

the kitchen on preparing food for the compound" -- which Snype continued doing

through much of the pandemic -- and then working as an orderly in Wilson's unit.  *Id.*

Wilson described Snype as having a "fantastic work ethics" (*sic*) and being willing to

take on extra duties when asked.  *Id.*  Wilson "highly" recommended that Snype "be

given another chance at life outside of the prison so he can use the skills he has gathered

inside to help young men not make the mistakes he made."  *Id.* at 24.

These two letters speak for themselves.  Snype has certainly bettered

himself in prison.

## IV.      Snype's Motions for Compassionate Release

In December 2020, Snype, *pro se*, filed two motions pursuant to 18 U.S.C.

§ 3582(c)(1)(A)(i), the so-called "compassionate release" statute, seeking a sentence

reduction.  *See* Dkt. Nos. 125, 126.  In these motions, Snype argued that release was

warranted because (1) he must care for Flowers; (2) he has a higher risk of severe illness

from COVID-19 due to his age and asthma; (3) he has significantly rehabilitated himself;

and (4) his prior convictions were incorrectly classified as "serious violent felonies."  *See*

*generally* Dkt. Nos. 125, 126.

I denied the motions, concluding that Snype had failed to establish an

extraordinary and compelling reason meriting release.  I found that (1) Snype had failed

to establish that he was the only person available who could act as Flowers's caregiver,

*see United States v. Snype*, No. 02-CR-00939-3, 2021 WL 1178238, at *3 (S.D.N.Y. Mar. 29, 2021); (2) the Bureau of Prisons ("BOP") had taken recent steps to address inmate safety during the COVID-19 pandemic and Snype had recently reported to medical staff that he felt "good," *id.* at *4; and (3) Snype's rehabilitation, while commendable, was not in itself an extraordinary and compelling reason for release, *id.* at *5 n.4.  Nonetheless, I encouraged Snype to "continue his efforts to turn his life around" and to file another motion under 18 U.S.C. § 3582(c)(1)(A)(ii), which applies to defendants over seventy years of age who have served at least thirty years of their sentence, "when the time comes, or under § 3582(c)(1)(A)(i) again should circumstances change."  *Id.* at *5.

On March 27, 2023, Snype, represented by counsel, filed the instant motion for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i).  *See generally* Dkt. No. 145.  Snype is now sixty-two years old.  *See* Dkt. No. 145 at 3.

In the present motion, Snype asserted that he has exhausted his administrative remedies within the BOP and enumerated several factors that, according to him, constitute extraordinary and compelling reasons for a sentence reduction.  I discuss these factors at length below, but they include the poor health condition and homelessness of Flowers, his "common-law" wife; the relative harshness of his sentence (he is one of only three incarcerated persons in the Second Circuit presently serving life sentences on account of the "three strikes" law); his susceptibility to COVID infection given his age (sixty-two); his time served to date (twenty-one years' imprisonment); his

exemplary disciplinary record in prison; the fact that he cannot transfer to a low-security facility, despite his clean disciplinary record, because of his life sentence; and his plans to reunite with his family and seek employment upon release. *See* Dkt. No. 145 at 3-5. Snype appended to the instant motion his petition (with exhibits) to the warden of FCI Allenwood seeking compassionate release, dated February 6, 2023, Ex. A; a letter from the warden denying his request for compassionate release, Ex. B; this Court's denial of his first motion for compassionate release, dated March 26, 2021, Ex. C; and his commissary report, dated February 27, 2023, Ex. D.

The Government submitted a letter in opposition on April 18, 2023. *See* Dkt. No. 147. The Government does not dispute that Snype has exhausted his administrative remedies. *Id.* at 3 n.2. The Government, however, disagrees with Snype that there are extraordinary and compelling reasons for compassionate release. First, the Government disputes whether Snype is the only available caregiver for Flowers. *Id.* at 4. Second, the Government argues that Snype's instant conviction and his prior New York State convictions "constitute 'serious violent felonies.'" *Id.* at 4-5. Lastly, the Government argues that neither Snype's health nor his rehabilitation warrant release because (1) "Snype's medical records for the last two years," which the Government appended to its opposition letter, "do not appear to reflect any significant chronic conditions from which Snype suffers," and (2) although Snype's rehabilitation is "commendable," it is not "extraordinary." *Id.* at 5.

## DISCUSSION

### I. <u>Applicable Law</u>

As amended by the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 ("First Step Act"), the compassionate release statute empowers sentencing courts to exercise their discretion in deciding motions such as Snype's.  The First Step Act brought about "monumental" change -- that is, allowing for the "release of thousands of imprisoned people whom Congress and the Executive believed did not need to be incarcerated" -- but did so "incremental[ly]."  *United States v. Brooker*, 976 F.3d 228, 230 (2d Cir. 2020).  Indeed, "rather than mandating more lenient outcomes, [the statute] favor[s] giving discretion to an appropriate decisionmaker to consider leniency."  *Id.*

To be eligible for a reduced sentence, an incarcerated person must make three showings.  "First, absent waiver or forfeiture by the government, an inmate must exhaust administrative remedies by requesting such relief from prison authorities."  *United States v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2020) (per curiam).  Then, the court must "consider[] the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable."  18 U.S.C. § 3582(c)(1)(A); *see also United States v. Jones*, 17 F.4th 371, 374-75 (2d Cir. 2020) (per curiam).  Finally, "the inmate must demonstrate that his proffered circumstances are indeed 'extraordinary and compelling' such that, in light of the[] § 3553(a) factors, a sentence reduction is justified."  *Keitt*, 21 F.4th at 71.

12

"As relevant here, Snype's mandatory life sentence does not bar this Court from granting compassionate release."  *Snype*, 2021 WL 1178238, at *3 (collecting cases). In fact, district courts in this Circuit, and others, have recently granted compassionate release to defendants serving mandatory life sentences imposed under the "three strikes" law.  *See, e.g.*, *United States v. Suggs*, No. 99-CR-244, 2021 WL 2661874, at *6 (D. Conn. June 28, 2021) (granting compassionate release "when mandatory lifetime sentence was predicated on offenses [defendant] committed while a teenager with a serious and untreated drug addiction"), *reconsideration denied*, 2021 WL 3514667 (D. Conn. Aug. 9, 2021); *United States v. Carroll*, 98-CR-351, 2020 WL 8024485, at *7-*8 (E.D. Mo. Sept. 14, 2020).  *But see Snype*, 2021 WL 1178238, at *3 ("Other courts have been more hesitant." (collecting cases)).

Generally, the First Step Act "freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release."  *Brooker*, 976 F.3d at 237.  Indeed, "a district court's discretion in this area -- as in all sentencing matters -- is broad."  *Id.*  "[T]here is nothing in the compassionate release law requiring that a determination of extraordinary and compelling factors warranting compassionate release must be based on a single circumstance.  Rather, as the law permits and common sense dictates, the finding of extraordinary and compelling circumstances warranting release can be based on a combination of circumstances taken together."  *United States v. Rengifo*, 569 F. Supp.

3d 180, 192-93 (S.D.N.Y. 2021); *cf. United States v. Sila*, No. 16-CR-0448-B, 2022 WL 800113, at *5 (N.D. Tex. Mar. 16, 2022) (denying sentence reduction where combination of circumstances was not extraordinary and compelling).

"The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'" *Brooker*, 976 F.3d at 237-38 (citing 28 U.S.C. § 994(t)). Rehabilitation can, however, "interact" with other factors to constitute extraordinary and compelling reasons to reduce a sentence. *Id.* at 238 (discussing the interaction of rehabilitation and the effects of the COVID-19 pandemic); *see also United States v. Millan*, No. 91-CR-685, 2020 WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020) ("[R]ehabilitation *is relevant* to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute 'extraordinary and compelling reasons' for a sentence reduction." (emphasis in original)).

## II.   <u>Application</u>

As a threshold matter, it is undisputed that Snype has exhausted his administrative remedies. *See* Dkt. Nos. 145, Ex. B.; 147 at 3 n.2. I therefore first consider if there exist extraordinary and compelling reasons permitting a reduced sentence. Finding that they do, I then consider, in light of the factors set forth in 18 U.S.C. § 3553(a), whether a sentence reduction is warranted and, if so, to what extent.

### A.      Extraordinary and Compelling Circumstances

As noted above, Snype has proffered several reasons why he merits a reduced sentence, including his mandatory life sentence, age when he committed the offenses that counted as "strikes," Flowers's need for care and his unique ability to provide it, his difficult conditions of confinement, and his impressive rehabilitation. Taking them together, I am persuaded that Snype has made a showing of extraordinary and compelling reasons sufficient to permit a reduction of his life sentence.

### i.      Snype's Mandatory Life Sentence

As I told Snype roughly twenty years ago when I sentenced him, it was neither "unreasonable [n]or irrational in any way" for Congress to have decided that "someone who commits three serious violent felonies is deserving of a life sentence." Dkt. No. 130, Ex. A at 15.  Even so, a reasonable and rational policy decision can have harsh consequences, some that become even harsher over time.

At sentencing, I also told Snype that:  "[i]t is a difficult thing to send someone to prison for life," *id.* at 32; "I have no choice," *id.* at 31; although the applicable guidelines range for Snype's Offense Level of 37 and Criminal History Category III was 262 to 327 months, the "three strikes" statute controls, *see* Dkt. No. 58; and, therefore, I had to sentence him to a term of life imprisonment, *see* Dkt. No. 130, Ex. A at 32.  The Second Circuit affirmed the applicability of the "three strikes" law to Snype's sentencing, *see Snype*, 441 F.3d at 153, and, as the Government points out, I too have

repeatedly rejected Snype's argument that the instant conviction and his prior New York state robbery convictions do not constitute "serious violent felonies," Dkt. No. 147 at 4.

Although the sentence imposed on Snype was required by law, I recognize that a mandatory life sentence in this case is exceptionally harsh.  *See United States v. Carlton*, No. 05-CR-796, 2022 WL 17104061, at *3 (S.D.N.Y. Nov. 22, 2022), *reconsideration denied*, 2023 WL 1070219 (S.D.N.Y. Jan. 27, 2023) ("In resolving a compassionate release motion, district courts are permitted to consider whether the relative harshness of a sentence constitutes an 'extraordinary and compelling reason' favoring release." (citing *Brooker*, 976 F.3d at 237)).

Two of the three convictions that I had identified as "serious violent felonies" under the "three strikes" statute occurred at least forty years ago, when Snype was nineteen and twenty-two years old, respectively.  *See* PSR ¶¶ 57-64 (listing a 1981 conviction for attempted robbery in the first degree, and a 1983 conviction for robbery in the first degree).  In the roughly forty-five years since Snype was first arrested at age eighteen, *see* PSR ¶ 47, there has been increased judicial sensitivity, driven by substantial research, to the role that a criminal defendant's adolescence should play in sentencing.  *See Roper v. Simmons*, 543 U.S. 551, 569-70 (2005) (holding that adolescents' immaturity, susceptibility to peer influence, and dependence mean "their irresponsible conduct is not as morally reprehensible as that of an adult"); *United States v. Ramsay*, 538

F. Supp. 3d 407, 428 (S.D.N.Y. 2021) (finding, in light of insights from neuroscientific research, that defendant's age of eighteen at the time of his offense contributes to a sentence reduction from mandatory life to 360 months); *United States v. Cruz*, No. 3:94-CR-112, 2021 WL 1326851, at *5-7 (D. Conn. Apr. 9, 2021) (finding that defendant's age of eighteen at the time of the offense is one extraordinary and compelling reason justifying immediate release despite mandatory life sentence).

I recognize Snype committed the underlying offense for which the mandatory life sentence was imposed -- conspiracy to commit bank robbery -- as an adult, when he was forty-one years old and after he had already served an eleven-year term of imprisonment.  But even so, one cannot ignore the significant role that, because of the "three strikes" law, Snype's youthful transgressions played in his sentencing.  *See Suggs*, 2021 WL 2661874, at *6 (finding that defendant's age of nineteen when he committed two of his "strikes" was an extraordinary and compelling reason warranting reduction in sentence from mandatory life imprisonment to 360 months); *Carroll*, 2020 WL 8024485, at *7 (granting compassionate release to "three strikes" defendant whose life sentence was predicated on a manslaughter and robbery that defendant committed at age sixteen).  It is because of the "three strikes" law that Snype's pattern of poor decisions and extended criminal history ultimately led him to be sentenced to live out the rest of his days in prison, rather than, for example, to serve a (still) substantial sentence within the otherwise applicable Guidelines range of 262 to 327 months.  In

other words, Snype's armed robbery convictions, from over forty years ago when he was an adolescent or young adult, were the difference between Snype knowing that he would never again spend time with his family outside prison bars and knowing that he would be reunited with his family in some twenty or so years.

Moreover, as Snype points out, *see* Dkt. No. 145 at 11, the crime for which I sentenced him, conspiracy to commit bank robbery, carries a five-year statutory maximum, *see* 18 U.S.C. § 371. Although this statutory maximum is not indicative of what a proper sentence is in this case, the discrepancy between five years and a lifetime shows, again, the devasting impact that Snype's poor early decision-making had on his sentencing outcomes as an adult.

### ii.    *Snype's Common-Law Spouse*

In denying Snype's first motion for compassionate release, I determined that Snype "fail[ed] to meet the high standard required to show that he is the only person available who can act as his partner's caregiver." *Snype*, 2021 WL 1178238, at *3. That motion, however, filed *pro se*, included little more than Snype's own words to show that Flowers was severely suffering from schizophrenia and Snype was the only person who could care for her. *See* Dkt. No. 125. By contrast, the instant motion for compassionate release appends affidavits attesting to those circumstances. Flowers, as mentioned above, submitted a letter to the Court detailing her suffering. *See* Dkt. No.

145 at 15.  Affidavits from Snype's family members corroborate Flowers's challenging circumstances.

For example, in an affidavit dated November 7, 2022, Snype's sister, Charisse, referred to Flowers as her "sister-in-law" and stated that she "hop[es] . . . Snype is allowed . . . to come home to take care of his wife"; each time she has seen Flowers "in the last few months . . . she is always soiled with urine and feces and has a smell of both"; Flowers "has been sitting and living on the sidewalk like a homeless person," which is "heartbreaking to see"; if Snype were not incarcerated, Flowers "would be living in a home with him and [would be] taken care of . . . and she would be safe"; and although Flowers "expresses that she needs her family and wants [to] come home[,] she has refused every attempt . . . [and] has expressed to [Charisse] that she will come home after [Snype] comes to get her."  *Id.* at 16.

Similarly, in an affidavit dated October 19, 2022, Snype's Niece, Cherie, swore that she sees Flowers on the streets of the Bronx "all the time"; Flowers "sleeps in the street, she's dirty and smelly"; when she checks on Flowers, Flowers only asks her about Snype; Flowers tells her that she is "waiting on him to come and get her . . . [and] she's not going nowhere with nobody except him" (*sic*); Flowers has "been robbed, hurt and abused living out in the streets to the extent nobody will ever know"; Flowers "is missing her teeth . . . [and] her toes"; and Snype "needs to be able to come home to take care of his wife and his children."  *Id.* at 17.

Next, in a September 2021 letter, Flowers's sister, Julia Rhaburn, in addition to confirming that Flowers desperately needs Snype as a caregiver, explained that she cannot serve as Flowers's caregiver because she lives in Georgia with her elderly, disabled husband, whom she cares for full-time. *See id.* at 19.  Similarly, by letter dated January 21, 2023, Snype's sister, Anita, explained that she cannot help Flowers because her health and the health of her partner have declined in recent years, such that Anita herself is looking for a home aide to provide additional care. *Id.* at 21.

Finally, by letter dated February 28, 2023, Snype explained that he not only is extremely committed to helping Flowers, but that, due to his education and experience, he is also uniquely positioned to do so.  Snype wrote, in relevant part:

> My kids mother Laureen is living a life no person should be subjected to.  Mental [i]llness [runs] in her family, she inherited the disease and she is suffering unjustifiably.  She was not perfect in our relationship, but she doesn't deserve to suffer in the manner that she is.  I honestly believe I can bring her back to stability.  I was a counselor in the field of mental illness.  I majored in Psychology.  I trained at Bronx State Psychiatrics Center, and I have the patience and desire to bring her home.  I am confident, one year after my release, Laureen will be a different person.  [No] one will recognize her as the homeless woman sleeping on the train.  I humbly ask that you grant me the opportunity to help her.

Dkt. No. 150 at 5.  Moreover, Snype has thought about how he would be able to support Flowers upon release:  Anita has offered for Snype to reside in her spare bedroom with Flowers "while she's in his care." Dkt. No. 145 at 21.  Snype intends to use the funds he has accumulated while in prison -- over $9,500 in savings as of February 2023 -- to help

him find employment, perhaps by buying a truck to use for making deliveries. *Id.* at 3,

45; Dkt. No. 150 at 2. But, as he clarified, this employment will not interfere with his

ability to care for Flowers, as she "will accompany [Snype] through the day on each and

every delivery," and "[s]he will be with [him] 24-7, which will significantly help her

memory and ability to return to stability." Dkt. No. 150 at 2.

       In sum, these affidavits and letters support the conclusion that no one can

realistically help Flowers -- other than Snype. He has mental health care experience,

and other family members are unable to help because they have jobs that would

interfere with providing full-time care (*e.g.*, Cherie, *see* Dkt. No. 150 at 2), live outside

New York (*e.g.*, Rhaburn, *see* Dkt. No. 145 at 19), have dependents (*e.g.*, Rhaburn, *id.*), or

need help of their own (*e.g.*, Anita, *id.* at 21). Snype has also shown that it is feasible for

him to serve as Flowers's caregiver upon release.

       Nonetheless, there are still some impediments to concluding that

Flowers's deteriorating health is, on its own, an extraordinary and compelling reason

for reducing Snype's sentence. Although Snype has painted a vivid picture in the

instant motion of Flowers's suffering and the circumstances necessitating that he serves

as her caregiver, Snype has been unable to care for Flowers for over twenty years now.

And, as the Government points out, there is the risk that, in light of Flowers's mental

condition, she will refuse Snype's health, or that Snype, who will be facing his own

challenges upon release, will be unsuccessful in caring for Flowers. *See* Dkt. No. 147 at

4.  For these reasons, Flowers's circumstances are insufficient alone to constitute

extraordinary and compelling reasons.

### iii.  Snype's Age and Conditions of Confinement

Snype will be sixty-three years old in November, and he has served

approximately twenty-one years of his life sentence.  *See* PSR at 1.  He argues that his

age and race make him more susceptible to complications, including death, from

COVID-19, *see* Dkt. No. 145 at 4, and that the conditions of his confinement have been

"far worse over the course of the last [three] years or so due to COVID-19 and [the]

internal controls put in place as a result," Dkt. No. 150 at 3.  Snype also argues that any

reduction in his sentence would substantially improve his conditions in prison.   Dkt.

No. 145 at 6.  I address each argument in turn.

As to Snype's medical condition, I am cognizant that his age and race

place him at an increased risk of experiencing serious illness from COVID-19.  *See*

Centers for Disease Control and Prevention, *COVID-19: People at Increased Risk -- People*

*with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/people-with-medical-conditions.html.  But Snype has been vaccinated, *see*

Dkt. No. 147, Ex. A at 22, and this argument is generally less forceful now than at the

outset of the pandemic, *see, e.g., United States v. Brown*, No. 18-CR-339, 2021 WL 5233506,

at *3 (S.D.N.Y. Nov. 10, 2021) (noting that because "the mass-release of vaccinations in

the past months have dulled the threat of severe complications or death from COVID-19

and its variants . . . the abstract threat of COVID-19 is no longer commonly accepted as a justification for compassionate release" (collecting cases)).  Moreover, the Government is correct that Snype's current medical records "do not appear to reflect any significant chronic conditions from which Snype suffers," and that his "recent visits with medical staff appear to have focused on lower back pain from an old injury, a wound to his finger, and his vaccinations."  Dkt. No. 147 at 5, Ex. A.  Thus, I am not persuaded that Snype is suffering from a serious medical condition rising to the level of "extraordinary and compelling."  Still, his medical situation, such as it is, is a factor to consider.

The conditions of Snype's confinement are also relevant.  Since 2013, Snype has been incarcerated at FCI Allenwood, in either a medium- or high-security unit.  *See* Dkt. No. 145 at 22.  I recently addressed the conditions of confinement in a medium-security unit at Allenwood, observing, like many other courts in this District have, that the pandemic has "render[ed] the conditions of confinement far harsher and more punitive than the Court had anticipated."  *United States v. Banks*, No. 99-CR-1048-1, 2022 WL 16549304, at *6 (S.D.N.Y. Oct. 31, 2022) (Chin, *J.*) (citation omitted).  Like many others, Snype has experienced repeated lockdowns, extended periods without visitation from family and legal counsel, and severely restricted movement.  *See* Dkt. Nos. 144 at 4-5; 150 at 3 & n.1.  Snype maintains that lockdowns at Allenwood are still very common, noting that it was due to a lockdown that his counsel sought an extension

from the Court related to this motion, as Snype could not communicate with his counsel during the two-week period allotted for his reply.  *See* Dkt. No. 150 at 3 n.1.

Given Snype's low-level disciplinary history, *see* Dkt. No. 145 at 22, it seems unnecessary to confine him in a setting other than a low-security facility.  But Snype's current life sentence "acts as a hold on such a transfer." *Id.* at 6.  Even the Government does not dispute that "with just 10 custody points" Snype is, but for his life sentence, "otherwise eligible" to "transfer to a low-security facility with less violence and one closer to home." *Id.*  Nor does the Government dispute that Snype's life sentence also prevents him from earning good time credits and participating in programs afforded to the vast majority of others who are incarcerated.  *Id.*

### iv.    *Snype's Rehabilitation*

The most compelling evidence of Snype's rehabilitation is contained in the two letters from Allenwood staff, discussed above, attesting to his character, maturity, and readiness to return to society.  In those letters, both Unit Secretary C. Shoemaker and Senior Officer A. Wilson portrayed Snype as a faithful mentor to others, vouched persuasively for him to be given another chance, and recognized his preparedness for reentry.  *See* Dkt. No. 145 at 22-24.

Snype's rehabilitation is also supported by his continued close relationship with his family.  *See United States v. Underwood*, 88-CR-822, 2021 WL 3204834, at *4-5 (S.D.N.Y. Jan. 15, 2021) (granting sentence reduction in light of record of

mentorship of younger inmates, absence of disciplinary infractions, and "commendable efforts in raising and supporting his children and grandchildren from behind bars"). Despite being incarcerated for the last twenty-one years -- and for roughly half his life in total -- Snype has maintained a strong relationship with his four children and continued to "guide" them over the years.  Dkt. No. 150 at 5.  His sons have visited him most recently.  *Id.*  As mentioned above, Anita, Snype's sister, has offered to permit Snype (and Flowers) to reside in her spare bedroom upon Snype's release.  *See* Dkt. No. 145 at 20-21.  And, as discussed, Snype is eager to ameliorate Flowers's suffering and help her regain her life.  *See* Dkt. No. 150 at 5.

Finally, Snype's rehabilitation is further evidenced by his full satisfaction, as of April 15, 2016, of "restitution in the amount of $13,419.00 and the special assessment in the amount of $100.00 amounting in all to the sum of $13,519.00."  Dkt. No. 113.[2]  Although the amount of restitution was imposed on a joint and several basis with two of Snype's accomplices, Snype steadily provided his share of restitution payments while incarcerated.  *See generally* Docket, *United States v. Snype*, No. 02-CR-0939-3 (S.D.N.Y.); *see also United States v. McCoy*, 981 F.3d 271, 278 (4th Cir. 2020) (affirming rehabilitation, shown through education, vocational achievements, and

---

[2]    As noted above, Snype's financial circumstances, I imposed no fine at sentencing.  *See* Dkt. No. 130, Ex. A, at 31.

payment of restitution, as a factor contributing to extraordinary and compelling reasons for sentence reduction).

The Government concedes that Snype's rehabilitation is "commendable" and that he "appears to be on a positive path" but notes that "rehabilitation alone" cannot be an extraordinary and compelling reason.  Dkt. No. 147 at 5.  I agree that rehabilitation alone is not enough, but I do not consider Snype's rehabilitation in a vacuum.

In fact, none of the circumstances Snype proffered in support of compassionate release -- his unique ability to care for Flowers, mandatory life sentence, age when he committed his predicate "strikes," conditions of difficult confinement, and impressive rehabilitation -- would alone permit a sentence reduction under section 3582(c)(1)(A)(i).  Nonetheless, "[w]here 'no single factor alone' may justify release, the total circumstances may still rise to the level of extraordinary and compelling reasons for release." *United States v. Ramirez*, 571 F. Supp. 3d 40, 48 (S.D.N.Y. 2021) (citation omitted).  And when I consider the confluence of all these circumstances, I conclude that Snype has made a showing of extraordinary and compelling reasons sufficient to permit a reduction of his life sentence.

B.     *The Section 3553(a) Factors*

That Snype has asserted extraordinary and compelling reasons for a sentence reduction renders him eligible, under the First Step Act, for such a reduction.  I

may only grant his motion, however, if I find that a sentence reduction is warranted in light of the applicable factors in 18 U.S.C. § 3553(a).  Considering the relevant section 3553(a) factors, I find that a substantial reduction is warranted and that further incarceration would be greater punishment than necessary for Snype.[3]

Snype undoubtedly engaged in gravely wrong and reckless conduct that could have seriously injured or killed innocent bystanders or law enforcement officials, and that did lead to the death of an accomplice.  As the Government appropriately summarizes, "Snype robbed a parking lot attendant at gunpoint, robbed a bank at gunpoint, led officers on a high-speed chase during which he *fired shots toward officers*, fled after his vehicle crashed, and remained a fugitive for five days until he was apprehended."  Dkt. No. 147 at 5.  The seriousness of Snype's offense is compounded by the fact that he engaged in this conduct at a mature age, as a forty-one-year-old, after two prior armed robbery convictions and after having already completed an eleven-year prison term.  *See Snype*, 2021 WL 1178238, at *4.  Nonetheless, Snype's prior offenses occurred over forty years ago, and he has maintained a positive prison record

---

[3]      The factors relevant to Snype's motion include:  the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  *See* 18 U.S.C. § 3553(a).

over the past twenty-one years -- as his partner has suffered tremendously from her mental illness in his absence.

        Although Snype's criminal record reflects a propensity to commit armed robbery, it is apparent to me now, just as it was at sentencing, that despite his convictions, Snype has good within him. *See* Dkt. No. 130, Ex. A at 32-33 ("You are educated, you are in a master's program.  You provided care to not only to your own children, but to Ms. Hicks' other children, and so it is baffling to see that part of you and yet to see how you could do these other things, and it is difficult, but I hope that you can seize on those glimmers of good to try and do something productive with yourself.").  Over the past twenty-one years, Snype has consistently shown his good character -- that is, more than just "glimmers of good."  Contrary to the Government's view, Snype's rehabilitation is more than just "commendable."  Dkt. No. 147 at 5.  In fact, it is "extraordinary."  Aside from maintaining a low-level disciplinary record, Snype has shown himself to be a matured person, one who is eager to mentor and help others, to build community, to succeed in employment, and to pay back those he has harmed.  *See* Dkt. Nos. 145 at 22-24; 150 at 5.  He has also shown himself to be a committed father to his children, as he has continued to maintain relationships with them as they embark on parenthood themselves.  *See* Dkt. No. 150 at 5.  The letter Snype wrote to the Court in support of his motion displays remorse for his actions, a deep sadness for Flowers's suffering, a strong commitment to helping her get better, and a respectful request that

he be given another chance.  *Id.*  These, too, are aspects of Snype's "history and characteristics," in addition to his criminal record.  18 U.S.C. § 3553(a)(1).  Therefore, although the "nature and circumstances of the offense" and Snype's criminal history, as a whole, arguably weigh against release, I recognize that there are mitigating considerations that support reducing Snype's sentence.

As to the "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), these purposes, in Snype's case, have largely been accomplished.  He has spent twenty-one years behind bars for this offense -- a third of his life.  That is far from an insignificant sanction.

Next, as to "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), I note that Snype's early release would not create any meaningful sentence disparities.  Indeed, his early release might rectify an existing disparity against him.  Statistics compiled by the United States Sentencing Commission, for example, show that for fiscal year 2022, the nationwide average and median sentence length for robbery convictions was 106 and 96 months, respectively.  *See* Fiscal Year 2022 Statistical Information Packet at Table 7, U.S. Sentencing Commission, April 2023.  In the Second Circuit, the average and median sentence length was 69 and 57 months, respectively.  *Id.*  Murder, sexual abuse, and kidnapping take first, second, and third

place for the longest sentences, respectively, with the nationwide average and median

sentence length being 261 and 240 months for murder, 207 and 180 months for sexual

abuse, and 184 and 160 months for kidnapping.  *Id.*  The twenty-one years Snype has

served thus far either surpasses, or would soon surpass, both the average and median

sentence lengths for all three of these crimes.  *See Carroll*, 2020 WL 8024485, at *8

(reducing "three strike" defendant's life sentence to time served because, *inter alia*, his

twenty-two years' imprisonment for armed bank robbery surpassed the average

sentences for robbery, extortion/racketeering, child pornography, and murder). [4]

Accordingly, this factor supports reducing Snype's sentence.

   The "need for the sentence imposed to . . . afford adequate deterrence to

criminal conduct," 18 U.S.C. § 3553(a)(2)(B), and to "protect the public from further

crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C), also weighs in favor of a sentence

reduction.  It is clear that Snype's eleven-year prison stay prior to the instant offense did

not effectively deter him from engaging in this armed robbery.  Even so, I am reassured

not only by the marked differences in Snype's character and evidence of his

extraordinary rehabilitation, but also by the fact that Snype, who was in his thirties

when he finished his eleven-year term of imprisonment, is now sixty-two years old.

---

[4] As noted in *Suggs*, there are only three defendants in the entire Second Circuit that are presently serving life terms based on the "three strikes" law; Snype is one of them.  *See* 2021 WL 2661874, at *9; *see also United States v. Matthews*, No. 5:05-CR-519 (N.D.N.Y.); *United States v. Johnson*, No. 96-CR-932 (E.D.N.Y.).

Indeed, the recidivism rate for offenders released before age 50 is 54.1% -- substantially greater than the rate of 17.8% for offenders released between ages 60 and 64.  *See* Older Offenders in the Federal System at 55, U.S. Sentencing Commission, July 2022. Accordingly, Snype's disciplinary history and significant rehabilitation, combined with his advanced age and greater maturity, suggest that there is little "need" for his life sentence when it comes to deterrence and protecting the public.

* * *

At the very crux of compassionate release is the recognition that "no man is beyond redemption." *Lawson v. U.S. Citizenship & Immigr. Servs.*, 795 F. Supp. 2d 283, 298 (S.D.N.Y. 2011) (citation and internal marks omitted).  Snype has redeemed himself. He has shown himself to be a caring, productive, and responsible person in his community.  With little or no hope of ever stepping foot outside a prison, Snype spent the last twenty-one years mentoring countless inmates, maintaining gainful employment, continuing to support his children, and redressing his victims -- all while keeping a "positive outlook on life," Dkt. No. 145 at 24, and even while knowing that Flowers was suffering tremendously.  Snype is deserving of a second chance.

Accordingly, after thorough consideration of the section 3553(a) factors -- in addition to Snype's twenty-one years of incarceration to date on this conviction, his maturity, age, low-level disciplinary history, extraordinary rehabilitation, and commitment to his partner and children -- I conclude that a life term of imprisonment in

this case is far greater than necessary and that the interests of justice weigh in favor of a

reduced sentence under section 3582(c)(1)(A)(i).  Snype's sentence of life imprisonment

is hereby reduced to time served plus no more than thirty days.

      Upon release, if the opportunity arises, I strongly encourage Snype to

participate in the Southern District's Re-Entry through Intensive Supervision and

Employment ("RISE") program.  I know that Snype would benefit greatly from the

support provided by the RISE program, which assists individuals recently released

from imprisonment in finding and maintaining employment, enhancing job skills,

acquiring stable housing, and supporting their families.

### III.   <u>Conclusion</u>

      For the foregoing reasons, Snype's motion for a sentence reduction is

GRANTED, and his sentence is modified to reduce the term of imprisonment from life

to time served plus no more than thirty days.  All other aspects of Snype's sentence

remain in full force and effect.

      The Clerk of the Court is directed to close Snype's motion, Dkt. No. 145.

      SO ORDERED.

Dated:     New York, New York
          July 19, 2023

DENNY CHIN
United States Circuit Judge
Sitting by Designation